UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

SOUTHERN ENVIRONMENTAL LAW      )
CENTER,                         )
                                )
            Plaintiff,          )
                                )
v.                              )            No.:  3:24-CV-97-TAV-DCP
                                )
TENNESSEE VALLEY AUTHORITY,     )
                                )
            Defendant.          )

## MEMORANDUM OPINION

This lawsuit arises from three Freedom of Information Act ("FOIA") requests made by plaintiff Southern Environmental Law Center ("SELC") to defendant Tennessee Valley Authority ("TVA").  Pending before the Court are plaintiff's motion for summary judgment [Doc. 38] and defendant's cross-motion for summary judgment [Doc. 42].  Pursuant to the Court's order [Doc. 45], plaintiff filed a combined response/reply brief [Doc. 46] and defendant filed a reply [Doc. 48].  Accordingly, this matter is now ripe for review.  *See* E.D. Tenn. L.R. 7.1(a).  For the following reasons, plaintiff's motion for summary judgment [Doc. 38] will be **DENIED**, defendant's motion for summary judgment [Doc. 42] will be **GRANTED**, and this case will be **DISMISSED**.

## I.    Background

On December 22, 2022 (the "December 2022" request), plaintiff requested the following records from defendant relating to the Cumberland Fossil Plant Retirement and associated pipeline project:

Beginning July 27, 2022 until the date of the search for responsive records, all records relating to TVA's cooperation with the U.S. Environmental Protection Agency ("EPA") on issues in the Cumberland Fossil Plant draft [Environmental Impact Statement ("EIS")]. This request includes, but is not limited to, communications between the agencies, meeting notes, EIS sections drafted for inclusion in the final EIS whether or not those sections were ultimately included in the final EIS, comments on drafts of the EIS, other EPA comments on TVA's NEPA process, and other TVA responses to EPA's comments.

[Doc. 1-1, p. 2]. Defendant acknowledged this request on January 24, 2023, indicating that it would require additional time to fulfill the request [Doc. 1-2].

On March 15, 2023 (the "March 2023" request), plaintiff requested the following records from defendant:

All records related to the Cumberland Fossil Plant Retirement Final Environmental Impact Statement (except for records cited in the Final Environmental Impact Statement or Record of Decision that are easily retrievable through TVA's website, including the Final Environmental Impact Statement, the 1/20/23 Record of Decision, and TVA's 2019 Integrated Resource Plan).

[Doc. 1-3, p. 2 (footnote omitted)]. Defendant acknowledged this request on March 16, 2023 [Doc. 1-4. In a separate acknowledgment dated April 12, 2023, defendant indicated that it would require additional time to fulfill the request [Doc. 1-5]. Plaintiff attaches email correspondence to its complaint wherein the parties appear to have narrowed the scope of this request to some extent [*See* Docs. 1-7, 1-8].

On April 20, 2023 (the "April 2023" request), plaintiff requested the following records from defendant:

All records of TVA's contractual agreement with Concentric Energy Advisors, Inc. [("Concentric")], related to Concentric's October 3, 2022 report entitled "Assessment of the Draft Environmental Impact Study and Response to Certain Reports."

2

[Doc. 1-9, p. 2 (footnote omitted)]. Defendant acknowledged this request on May 17, 2023, indicating that it would require additional time to fulfill the request [Doc. 1-10].

Plaintiff filed this action on February 29, 2024, alleging FOIA violations and seeking declaratory and injunctive relief [*See* Doc. 1]. On March 14, 2024, defendant responded to the December 2022 request, disclosing responsive records and invoking FOIA Exemptions 5 and 6 as to some records [Doc. 37-1]. On April 3, 2024, defendant responded to the April 2023 request, invoking FOIA Exemptions 4, 5, and 6 as to some records [Doc. 37-2]. Finally, on February 10, 2025, defendant responded to the March 2023 request, invoking Exemptions 3, 5, and 6 [Doc. 37-3].

On April 8, 2024, defendant moved to dismiss plaintiff's complaint on grounds that, in the time since plaintiff filed suit, it fulfilled the requests at issue, thereby mooting this litigation and/or requiring further administrative exhaustion on the part of plaintiff [*See* Doc. 19]. The Court denied defendant's motion, noting that "[p]laintiff's complained-of injury is not either a delayed response or an inadequate response; rather, it broadly alleges that defendant has not complied with an informational statute" [Doc. 32, p. 14]. Because defendant had not "produced every document requested in unredacted form," the Court determined that a live controversy remained [*Id.*].

The instant pending motions relate to the adequacy of defendant's responses to plaintiff's FOIA requests and whether defendant properly invoked various FOIA Exemptions [Doc. 39, p. 5; Doc. 43, p. 5].

3

## II.    Standard of Review

FOIA cases are typically decided on motions for summary judgment, as most challenges to an agency's invocation of a FOIA exemption implicate purely questions of law. *S. Envtl. Law Ctr. v. Tenn. Valley Auth.*, No. 3:22-CV-108, 2023 WL 2387360, at *5 (E.D. Tenn. Mar. 7, 2023) (citing *Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 544 (6th Cir. 2001)).   Under FOIA, an agency may withhold documents responsive to a FOIA request only if the withheld documents fall within an enumerated statutory exemption. *See* 5 U.S.C. § 552(b); *see also U.S. Dep't of Def. v. Fed. Lab. Rel. Auth.*, 510 U.S. 487, 494 (1994).   The agency bears the burden of justifying any withholding. *Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012) ("To prevail on summary judgment, the government must show that it made a 'good faith effort to conduct a search for the requested records using methods reasonably expected to produce the requested information' and that any withholding of materials was authorized within a statutory exemption.") (quoting *CareToLive v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011)); *see Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 74 (D.D.C. 2007).[1]

The resolution of a FOIA exemption's applicability at the summary judgment stage "creates a situation in which a plaintiff must argue that the agency's withholdings exceed the scope of the statute, although only the agency is in a position to know whether it has complied with the FOIA [request]." *Rugiero*, 257 F.3d at 544.   "Ordinarily, an agency will

---

[1]    The Court notes that it frequently cites District of Columbia cases throughout this Opinion.  While these out of circuit opinions are not binding on the Court, the frequency with which FOIA issues have arisen in the District of Columbia has produced a helpful body of case law that informs the Court's analysis.  Wherever possible, these citations are supplemented with Sixth Circuit precedent.

4

offer detailed affidavits, rather than the requested documents themselves, to justify its decision to withhold information, and these affidavits are entitled to a presumption of good faith absent evidence to the contrary." *Rimmer*, 700 F.3d at 255 (citing *Jones v. FBI*, 41 F.3d 238, 242–43 (6th Cir. 1994)).

Additionally, or alternatively, the agency may also provide a detailed description of the information withheld by submitting what is called a *Vaughn* index. *See Bigwood*, 484 F. Supp. 2d at 74; *see also Vaughn v. Rosen*, 484 F.2d 820, 826–27 (D.C. Circ. 1973). While a *Vaughn* index need not take a specific form, the agency should "disclose as much information as possible without thwarting the exemption's purpose." *Hall v. U.S. Dep't of Just.*, 552 F. Supp. 2d 23, 27 (D.D.C. 2008) (internal quotation marks omitted). Regardless of its form, the agency should justify its position with "a relatively detailed analysis" of "manageable segments" of the documents. *Am. Civ. Liberties Union of Mich. v. FBI*, 734 F.3d 460, 465 (6th Cir. 2013). The district court reviews the agency's decision to withhold documents based on the claimed FOIA exemptions *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

### III.    Analysis

#### A. Adequacy of TVA's Search

Plaintiff argues that defendant failed to conduct an adequate search for responsive records in responding to all three of its FOIA requests [Doc. 39, p. 7]. Specifically, it contends that defendant has failed to provide any information about the scope of its search and "the record indicates that TVA possesses other non-exempt responsive records that a

reasonable search should have uncovered" [*Id*.].[2]  Plaintiff cites defendant's omission of a record containing EPA's written feedback on the EIS from September 2, 2022, from its responses to the December 2022 and April 2023 requests, among other examples of wrongfully withheld material [*Id*. at 7–8].  Plaintiff also argues that defendant improperly narrowed the scope of its March 2023 request despite email correspondence that, it argues, addressed only "a certain subset of file and folder names" [*Id*. at 8].  In connection to the April 2023 request, plaintiff contends that defendant must have omitted other negotiation materials between TVA and Concentric, citing a publicly available source in support [*Id*. at 8–9].

Defendant contends that it reasonably interpreted each of plaintiff's three FOIA requests and conducted appropriate searches [Doc. 43, p. 9].  In support, it submits declarations of Julia Denise Smith, Sherri R. Collins, Ashley A. Pilakowski, and Marilyn White [*See* Docs. 42-1, 42-4, 42-8, 42-9].  These declarations, defendant argues, rebut plaintiff's premature argument that it failed to provide any information about the scope of its searches [Doc. 43, p. 10].

Plaintiff responds by arguing that defendant's declarations contain "only a high-level explanation" and do not adequately describe TVA's searches [Doc. 46, p. 4].  Citing specific statements contained in the declarations, it contends that this proof falls short of the standard established by FOIA [*Id*. at 5].  For example, it argues that Smith's

---

[2]  It is worth noting that plaintiff initially claimed that defendant had provided no justification for the scope of its searches and/or its withholdings prior to defendant's submission of declarations and a *Vaughn* index in its cross-motion for summary judgment [*See* Doc. 42].

statement that she notified subject-matter experts of the FOIA request is an insufficiently detailed description of the agency's FOIA process [*Id*. at 4].

Defendant replies by noting that several of the documents cited by plaintiff as proof of an inadequate search are records that, themselves, "fall outside the scope of the FOIA searches" [Doc. 48, p. 1].

FOIA requires agencies to undertake "reasonable efforts to search" for requested records. 5 U.S.C. § 522(a)(3)(C). In determining whether a governmental agency has substantively complied with § 552(a)(6)(A), courts generally focus on the agency's affidavits or declarations "providing reasonable detail of the scope of the search." *CareToLive*, 631 F.3d at 340. "In the absence of countervailing evidence or apparent inconsistency of proof, [such affidavits] will suffice to demonstrate compliance with the obligations imposed by the [Act]." *Id*. at 340–41 (internal quotations and citations omitted) (quoting *Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999)); *see Kohake v. Dep't of Treasury*, 630 F. App'x 583, 589 (6th Cir. 2015) (affirming district court's grant of summary judgment to government agency where "reasonable detail of the scope of the search . . . demonstrates that the [government] made a good faith effort to locate the requested documents and employed methods reasonably expected to produce the requested information"). "The Court determines the adequacy of a search by assessing the methods an agency used, not whether the search 'actually uncovered every document extant.'" *S. Env't L. Ctr. v. Tenn. Valley Auth*., 774 F. Supp. 3d 945, 950 (E.D. Tenn. 2025) (Crytzer, J.) (quoting C*areToLive*, 631 F.3d at 340).

## 1. SELC's December 2022 FOIA Request

In her sworn declaration, Smith states that upon receipt of the December 2022 request she informed SELC's attorney, Daniel Metzger, that additional time may be needed to complete the request [Doc. 42-1 ¶ 8]. Then, Smith contacted other TVA personnel with specialized knowledge or experience with National Environmental Policy Act ("NEPA") compliance to inform them of the request [*Id*. ¶ 9]. Collins states in her sworn declaration that such outreach to agency personnel with subject-matter expertise is a routine search method within TVA's FOIA office [Doc. 42-4 ¶ 14]. In connection with the December 2022 request, Collins states that she ultimately provided plaintiff with "three records in full and one record with partial redaction pursuant to FOIA Exemption 6" [*Id*. ¶ 17].

In its opening brief, plaintiff argues that defendant improperly withheld two specific records in connection with this request [Doc. 39, p. 7]. However, defendant submits that the two records identified by plaintiff as "missing" in response to the December 2022 request were ultimately released to plaintiff after "re-review of those records" [Doc. 43, p. 11]. In support, it submits an email to this effect from Whitney Carter, a TVA FOIA Officer, to SELC attorney Trey Bussey [Doc. 42-6, p. 1].

Defendant's declarations "demonstrate[ ] that the [government] made a good faith effort to locate the requested documents and employed methods reasonably expected to produce the requested information." *Kohake*, 630 F. App'x at 589. Specifically, Smith contacted subject-matter experts in accordance with TVA's FOIA Office policy and those experts, in turn, identified and produced responsive records [*See* Docs. 42-1, 42-4]. These explanations are rebuttably presumed to suffice for FOIA purposes "[i]n the absence of

8

countervailing evidence or apparent inconsistency of proof." *CareToLive*, 631 F.3d at 340–41. The fact that two records were initially withheld but subsequently disclosed to plaintiff upon further examination by the agency is insufficient to rebut this presumption.

### 2. SELC's March 2023 FOIA Request

Defendant first argues that plaintiff's use of the term "all records" in the March 2023 request is overboard and vague [Doc. 43, p. 12]. On this basis, it contends that plaintiff failed to satisfy the threshold requirement of a reasonably detailed FOIA request; alternatively, defendant contends that the term "all records" should be read in context of the March 2023 request as a whole [*Id.* at 13]. Additionally, it argues that plaintiff's email correspondence narrowed this request, indicating its assent to search for a subset of potential records [*Id.* at 14–15]. To claim that this correspondence did not narrow the request, according to defendant, is "nonsense" [*Id.* at 15]. Finally, as for potentially omitted documents, defendant argues this constitutes speculation [*Id.* at 16–17].

Plaintiff maintains that it did not agree to narrow its March 2023 search [Doc. 39, p. 8; Doc. 46, p. 6]. Moreover, it contends that defendant "conducted a myopic search" by selectively disclosing publicly available records while refusing to disclose modeling and analyses that were necessarily conducted in creating the final EIS and/or referenced in the body of the final EIS [Doc. 39, p. 8; Doc. 46, p. 7].

Defendant replies by again citing plaintiff's agreement to narrow this request [Doc. 48, p. 2]. Additionally, it argues that plaintiff misunderstands the nature of analyses and modeling used in the EIS process, which it submits are already "fully presented and described in the text of the Cumberland EIS" [*Id.*]. Defendant also states that it conducted

9

a document-by-document review of roughly 2,400 responsive records and plaintiff has failed to demonstrate how such a review is inadequate [*Id*].

Beginning with the agency's declarations, Smith states that upon receipt of the March 2023 request she contacted TVA personnel who are "most familiar with [relevant] records" and asked that they gather potentially responsive records [Doc. 42-1 ¶ 17]. She submits that Dawn Booker and Pilakowski are the personnel most familiar with records responsive to this request [*Id*.]. Smith further states that she spoke with attorney Bussey over the phone on July 20, 2023, during which they discussed "SELC potentially narrowing the Final EIS FOIA request" [*Id*. ¶ 19]. After exchanging emails, she submits that Bussey "had agreed to narrow the scope of the Final EIS FOIA request as reflected in the excel spreadsheet and Cumberland Retirement project folder" [*Id*. ¶ 22].

Over the following months, Smith states that she engaged a third-party vendor, Consilio, LLC ("Consilio"), to facilitate review of the approximately 2,400 potentially responsive records to this request [*Id*. ¶ 24]. White, the Project Lead at Consilio, separately explains in detail the vendor's process to review and identify potentially responsive records [*See* Doc. 42-9]. By late 2024, Consilio completed its review and identified approximately 180 potentially responsive records, which were further reviewed by TVA personnel prior to the ultimate release of 46 records [Doc. 42-1 ¶¶ 26–30]. As explained by Collins, defendant's *Vaughn* index provides additional detail about the categories of documents withheld or redacted under FOIA exemptions [Doc. 42-4 ¶ 37].

Defendant's declarations "provid[e] reasonable detail of the scope of the search," with respect to plaintiff's March 2023 request. C*areToLive*, 631 F.3d at 340. While the

Court acknowledges plaintiff's urged distinction between narrowing the scope of its overall request and narrowing a subsidiary portion of its request [*See* Doc. 39, p. 8], the email correspondence related to this search belies the argument that defendant unreasonably adjusted its parameters [*See* Doc. 1-7, p. 2]. *See Kohake*, 630 F. App'x at 589. If anything, the record shows that TVA FOIA personnel proactively engaged plaintiff to determine a workable search parameter that, even after some narrowing, resulted in a sufficiently large number of potentially responsive documents to warrant the agency's contracting with a third-party vendor to conduct further review. In sum, the Court finds that defendant used appropriate methods in responding to plaintiff's March 2023 request, which is the relevant question at this stage of analysis.[3] *See S. Env't L. Ctr.*, 774 F. Supp. 3d at 950.

### 3. SELC's April 2023 FOIA Request

Defendant argues that plaintiff's use of the term "all records," as with the March 2023 request, fails to provide sufficient guidance to TVA in fulfilling this FOIA request [Doc. 43, p. 17]. In any case, even if this term is permissibly detailed, defendant contends that it provided exactly the contractual agreements requested by plaintiff [*Id.*]. It submits that particularly given plaintiff's sophistication as a FOIA requester, the Court should understand plaintiff's request through the specific words it chose [*Id.* at 18; *see also* Doc. 48, pp. 2–3].

---

[3] Even if the Court were to address plaintiff's speculation regarding certain undisclosed documents upon which defendant allegedly relied in preparing the Final EIS, Pilakowski clarifies that none of the underlying modeling referenced by plaintiff is "part of the Cumberland project folder" [Doc. 42-8, p. 3].

11

Smith submits that upon receipt of this request, she contacted Pilakowski who informed her of TVA's relationship with Concentric [Doc. 42-1 ¶ 33]. TVA's Office of General Counsel provided Smith with certain responsive documents about which she informed Concentric to determine whether it wished to object to disclosure [*Id*. ¶ 36]. Concentric objected to the disclosure of certain information pursuant to FOIA Exemption 4 and, after further internal review, defendant withheld certain documents on this basis, as well as Exemption 5 [*Id*. ¶¶ 37–39]. In a letter dated March 21, 2024, a copy of which is attached to defendant's brief, Concentric CEO Danielle Powers states that "the release of this information would result in significant harm to our Company's competitive interests and could compromise our ability to conduct business effectively" [Doc. 42-3, p. 1]. Based on this statement, Collins further explains that defendant withheld and/or redacted certain information, including some Concentric work prepared at the request of TVA legal counsel [Doc. 42-2 ¶¶ 52–53].

As with the other two requests, the Court finds that defendant has provided a reasonably detailed description of its search procedures, including in this instance its conferring with a third-party whose commercial information was potentially responsive to plaintiff's April 2023 request. Having evaluated the threshold adequacy of defendant's searches in response to each of plaintiff's three FOIA requests, the Court finds that defendant substantively complied with FOIA insofar as it appears to have conducted appropriate searches based upon plaintiff's requests.

12

## B. Propriety of TVA's Withheld and/or Redacted Documents

Defendant invoked the following exemptions with respect to plaintiff's FOIA requests: (i) in response to the December 2022 request, it withheld intra-agency predecisional, deliberative information pursuant to Exemption 5 and telephone numbers pursuant to Exemption 6 [Doc. 18-1, pp. 1–2]; in response to the March 2023 request, it withheld information prohibited from disclosure by another statute pursuant to Exemption 3, predecisional, deliberative information, attorney-client communications, and/or attorney work-product pursuant to Exemption 5, and personal contact information pursuant to Exemption 6 [Doc. 37-3, pp. 1–3]; and (iii) in response to the April 2023 request, it withheld Concentric's commercial information pursuant to Exemption 4, legal communications pursuant to the attorney-client and attorney work-product privileges authorized under Exemption 5, and personal information pursuant to Exemption 6 [Doc. 18-2, pp. 1–2].

Plaintiff argues that defendant has not met its burden in justifying its withholdings pursuant to Exemptions 4 and 5,[4] including by failing to demonstrate foreseeable harm, the applicability of certain exemptions, and the segregability of non-exempt material [Doc. 39, pp. 10–20]. Defendant broadly defends its compliance in each of these areas, including through its submission of declarations and a *Vaughn* index [Doc. 43, pp. 16–25]. Having determined that defendant conducted reasonable searches as to all three FOIA requests (*see*

---

[4] Defendant states, and plaintiff does not appear to dispute, that plaintiff waived its challenges to withholdings pursuant to Exemptions 3 and 6 [Doc. 43, p. 5 n.2].

13

*supra* Section III(A)), the issues remaining are whether Exemptions 4 and 5 were appropriately applied in connection to plaintiff's requests.

## 1. TVA's Withholdings Under FOIA Exemption 4

Because defendant invoked Exemption 4 only in connection with the April 2023 request, this analysis pertains only to that request. With respect to FOIA Exemption 4, which pertains to confidential, commercial information, plaintiff argues that defendant failed to redact non-exempt portions of records and that its use of Exemption 4 was overbroad [Doc. 39, p. 17]. It contends that defendant must disclose records containing contract negotiations, citing case law requiring similar disclosures [*Id*. at 18–19].

Defendant notes that Concentric requested that it refrain from disclosing confidential, commercial information [Doc. 43, p. 24]. Additionally, it contends that the information provided by Concentric satisfies the various definitional requirements of Exemption 4, as discussed in greater detail below [*Id*.].

Exemption 4 shields from disclosure "trade secrets and commercial or financial information obtained from a person" that is "privileged or confidential." 5 U.S.C. § 552(b)(4). Where withheld records do not contain trade secrets, an agency must establish that the records are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential" to sustain the burden of showing that Exemption 4 was properly applied. *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin*., 704 F.2d 1280, 1290 (D.C. Cir. 1983); *see also Varnum LLP v. U.S. Dep't of Lab*., No. 1:18-CV-1156, 2021 WL 1387773, at *5 (W.D. Mich. Mar. 15, 2021) (granting summary judgment to defendant agency on grounds that Exemption 4 covered certain commercial and

14

confidential materials). Upon satisfying the Exemption 4 requirements, the government must then also satisfy FOIA's statutory foreseeable-harm requirement. 5 U.S.C. § 552(a)(8)(A)(i)(I) ("An agency shall withhold information . . . only if the agency reasonably foresees that disclosure would harm an interest protected by [one of the nine FOIA exemptions]").

### a. Sufficiency of Showing that the Withheld Information is Commercial

Defendant argues that the information for which it invoked Exemption 4 qualifies as "commercial" in nature [Doc. 43, p. 24]. Specifically, it cites a March 21, 2024, letter from Concentric in which the company describes the information at issue, which includes "contracts and billing rates," "pricing strategies," and "sensitive business information" [*Id.* at 25 (citing Doc. 42-3)].

The term "commercial" is not defined in FOIA. Absent a precise statutory definition or clarity from the legislative history, courts have "consistently held that [this] term . . . should be given [its] ordinary meaning." *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290; *see also Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002). "[I]nformation is 'commercial' under this exemption if, 'in and of itself,' it serves a 'commercial function' or is of a 'commercial nature.'" *Nat'l Ass'n of Home Builders*, 309 F.3d at 38 (quoting *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978)). Thus, "records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business," fall within the scope of "commercial" information. *Pub. Citizen Health Rsch.*

*Grp.*, 704 F.2d at 1290. For instance, documents that contain "revenue, net worth, income, and EBITDA" information are plainly commercial. *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009). The scope of "commercial" information has also been applied more broadly to records containing information in which the provider of the records has "a commercial interest." *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319–20 (D.C. Cir. 2006) (finding letters describing favorable market conditions for domestic lumber companies "plainly contain commercial information within the meaning of Exemption 4"); *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290 (finding information to be commercial when it was helpful or "instrumental" to the provider's business interests).

Defendant has established that the disputed documents are "commercial" within the meaning of Exemption 4. The information cited by Concentric in its March 21, 2024, letter falls squarely within the type of information envisioned by this exemption. *See, e.g.*, *Racal–Milgo Gov't Sys., Inc. v. Small Bus. Admin.*, 559 F. Supp. 4, 6 (D.D.C. 1981) (finding that Exemption 4 shielded information such as "audits of private concessions in national parks; technical proposals for development of a system to analyze gases generated by petroleum refineries; general selling prices, inventory balances, profit margins, purchase activity, freight charges, costs of goods sold, and customer names, obtained from a utility in the course of a government investigation; appraised value for customs duty assessment purposes of imported machinery parts; design recommendations, design concepts, a customer list, and biographical data on key employees; and computer usage, manpower allocation, travel costs, biographical data on employees, and detailed cost data

16

from a contract with the Government") (footnotes omitted).  Even if the Concentric material was not deemed commercial "in and of itself" in the *Nat'l Ass'n of Home Builders* sense, 309 F.3d at 38, it clearly constitutes material in which Concentric has "a commercial interest," *Baker & Hostetler LLP*, 473 F.3d at 319, which is "instrumental" to its business interests.  *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290.

In sum, defendant has demonstrated that its Exemption 4 withholdings in response to the April 2023 request "actually reveal basic commercial operations" and qualify as "commercial."  *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290.

### b. Sufficiency of Showing that Concentric Qualifies as a "Person"

Defendant next argues that it obtained the information at issue from a "person" within the meaning specified by FOIA [Doc. 43, p. 26].  Specifically, it notes that it obtained the information directly from Concentric and did not reformulate the redacted information such that it would otherwise belong to defendant [*Id*. at 26–27].

Plaintiff rejects this argument, contending that the Collins declaration does not provide sufficient evidence to support defendant's claim [Doc. 46, p. 18].  In reply, defendant emphasizes that Concentric's contracts and billing rates are not something that it can create or reformulate because these materials constitute their own sensitive commercial information [Doc. 48, p. 7].

FOIA defines "person" as inclusive of "an individual, partnership, corporation, association, or public or private organization other than an agency."  5 U.S.C. § 551(2); *see also Ctr. for Auto Safety v. U.S. Dep't of Treasury*, 133 F. Supp. 3d 109, 119 (D.D.C.

17

2015) (clarifying that Exemption 4's "person" term primarily distinguishes between internal and external information from the government agency's perspective).

Plaintiff's argument that defendant reformulated the withheld materials is unavailing. It bears repeating that Concentric specifically indicated that its own commercial information was present in the materials such that it requested that TVA not disclose this information [*See* Doc. 42-3]. Moreover, to hold that any negotiation or modification of terms by a government agency deprives a third-party of "person" status within the meaning of Exemption 4 would substantially undermine the purpose of this exemption, which is intended to protect private and commercially valuable information from public disclosure. In sum, defendant has satisfied this prong, as well.

### c. Sufficiency of Showing that the Withheld Information is Confidential

A "commercial" document may only be withheld under Exemption 4 if it is "privileged" or "confidential." 5 U.S.C. § 552(b)(4). Commercial or financial information is confidential if it is "(1) both customarily and actually treated as private by its owner and (2) provided to the government under an assurance of privacy." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019). Exemption 4 applies to all commercial information provided to agencies whether voluntarily or otherwise. Although the *Argus Leader* Court did not "need to resolve" whether the second condition—assurance of privacy—was necessary in every case, whether the agency provided an assurance of privacy is undoubtedly relevant to determining whether commercial information possessed by an agency is "confidential." *Argus Leader*, 588 U.S. at 435; *see also S. Env't L. Ctr. v.*

18

*Tenn. Valley Auth*., 659 F. Supp. 3d 902, 912 (E.D. Tenn. 2023) (applying *Argus Leader* to conclude that "business decisions, practices, and conduct" contained in agreements between TVA and natural gas pipeline companies were "confidential"). "In addition, in assessing customary disclosure, the court will consider how the particular party customarily treats the information, not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin*., 244 F.3d 144, 148 (D.C. Cir. 2001) (citing *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 878–80 (D.C. Cir. 1992) (en banc); *see also Argus Leader*, 588 U.S. at 434 (explaining that "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it").

Defendant has also established that the withheld documents are confidential for purposes of Exemption 4. Under the streamlined *Argus Leader* rule, defendant's burden is satisfied by definitively showing only the first requirement that information is "customarily and actually treated as private by its owner." *Argus Leader*, 588 U.S. at 440. Here, both Collins's declaration and Concentric's objection letter to TVA indicate that Concentric does not customarily disclose this information as such disclosure could arm its competitors with "pricing strategies, negotiation tactics, and client relationships" [Doc. 42-2 ¶ 52].

In sum, defendant's invocation of Exemption 4 in connection with the April 2023 request appears valid, subject to the matters of segregability and foreseeable harm (*see infra* Sections III(B)(3)–(4)).

### 2. TVA's Withholdings Under FOIA Exemption 5

#### a. Deliberative Process Privilege

Defendant invoked the deliberative process privilege in connection to its responses to plaintiff's December 2022 and March 2023 requests. Plaintiff argues that defendant improperly invoked the deliberative process privilege because its "boilerplate" statements "fail to state with any particularity how the records are both predecisional and deliberative" [Doc. 39, p. 15].

Defendant argues that its declarations and *Vaughn* index sufficiently justify its invocation of this and the attorney work-product and/or attorney-client privileges [Doc. 43, p. 20]. Specifically, it refers the Court to the *Vaughn* index's "subcategory-by-subcategory" descriptions justifying each of these privileges [*Id.* at 22].

Plaintiff contends that defendant's *Vaughn* index lacks sufficient detail to justify its invocation of deliberative process privilege [Doc. 46, p. 13]. First, it argues that many of the records are not demonstrably "predecisional" by mere virtue of their predating a final published EIS [*Id.*]. Plaintiff further asserts that defendant is obligated to clarify whether any of these earlier draft materials constituted the agency's position at that time [*Id.* at 14]. Second, it argues that defendant has failed to demonstrate that these materials were deliberative in nature [*Id.*]. Specifically, it cites defendant's withholding of meeting agendas despite caselaw in which courts have found meeting agendas are not deliberative in nature [*Id.* at 14–15].

FOIA's Exemption 5 incorporates recognized evidentiary privileges, including "the attorney-client privilege, the attorney work-product privilege, and the deliberative process

20

privilege." *Rugiero*, 257 F.3d at 550 (first citing *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); and then *Schell v. U.S. Dep't of Health & Human Servs.*, 843 F.2d 933, 939 (6th Cir. 1988)). For a record to qualify for the deliberative process privilege, specifically, it must "be both 'predecisional,' meaning it is 'received by the decisionmaker on the subject of the decision prior to the time the decision is made,' and 'deliberative,' the result of a consultative process." *Id.* (quoting *Schell*, 843 F.2d at 940). For example, the privilege shields "'documents reflecting advisory opinions, recommendations,' and 'deliberations comprising part of a process by which' the agency formulates its 'decisions and policies.'" *S. Env't L. Ctr.*, 774 F. Supp. 3d at 952 (quoting *Campaign Legal Ctr. v. U.S. Dep't of Just.*, 34 F.4th 14, 23 (D.C. Cir. 2022)). As recently clarified by the United States Supreme Court, "determining whether an agency's position is final for purposes of the deliberative process privilege is a functional rather than formal inquiry," meaning that courts should be alert to a potential "charade[.]" *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 272–73 (2021).

Turning first to defendant's invocation of the deliberative process privilege with respect to documents responsive to plaintiff's December 2022 request, the agency initially stated that the withheld records do "not represent a final agency position" and their disclosure would "compromise TVA's decision-making process by chilling open and frank discussions and exchange of information within TVA on decision-making and policy formulation" [Doc. 37-1, p. 2]. Plaintiff administratively appealed this decision and defendant provided further detail in its letter dated July 24, 2024 [*See* Doc. 42-2, pp. 2–3]. Specifically, TVA explained that certain withheld records "were created before the

21

adoption of the Final EIS and are therefore predecisional and deliberative because they reflect give and take communications and clarification on certain inputs and language choices" [*Id.* at 2]. Further, it stated that other records "were created before the adoption of the Final EIS, were subject to change, and did not reflect the final agency policy" [*Id.*]. Collins provides a more detailed breakdown of withheld documents, similarly attesting to their predecisional and deliberative nature [*See* Doc. 42-4, pp. 6–10]. In sum, defendant has demonstrated that it validly withheld records pursuant to the deliberative process privilege in response to plaintiff's December 2022 request because these records all appear related to predecisional and deliberative agency communications. *See S. Env't L. Ctr.*, 774 F. Supp. 3d at 952.

Turning to the March 2023 request, defendant similarly invoked the deliberative process privilege by citing similar concerns about chilling internal agency deliberations [Doc. 37-3, p. 2]. According to Collins, and as outlined in the *Vaughn* index, both categories of withheld documents include deliberative materials, that is the "Preliminary Draft Documents Related to FEIS" and "NEPA Coordination" [Doc. 42-4 ¶¶ 20–26; Doc. 42-5]. In support of this assertion, the *Vaughn* index notes that these records "are in draft form and contain deliberative and predecisional markets and in most instance, track change edits and comments from various TVA personnel" [Doc. 42-5, p. 1]. Additionally, defendant submits that "each record is a preliminary version subject to feedback and change" [*Id.*].

Although plaintiff correctly notes that defendant provides repetitive explanations for its invocation of the deliberative process privilege, this Court has previously explained

in the foreseeable harm context that some FOIA withholdings "necessarily [impose] limitations" on the differentiation of detail that an agency may provide. *Env't & Pol'y Inst. v. Tenn. Valley Auth.*, No. 3:22-CV-220, 2024 WL 4535983, at *8 (E.D. Tenn. Oct. 21, 2024) (Varlan, J.). So, while defendant repetitively cites the presence of track changes and comments for many withheld records, the presence of such "deliberative and predecisional markers" remains significant as to each of the records identified in the *Vaughn* index [*See* Doc. 42-5]. Defendant's declarations, which are entitled to a presumption of good faith, *see Rimmer*, 700 F.3d at 255 (citing *Jones*, 41 F.3d at 242–43), suggest that these withheld records contain "'deliberations comprising part of a process by which' the agency formulates its 'decisions and policies.'" *S. Env't L. Ctr.*, 774 F. Supp. 3d at 952 (quoting *Campaign Legal*, 34 F.4th at 23). In sum, defendant appears to have validly invoked Exemption 5's deliberative process privilege with respect to plaintiff's March 2023 request, as well.

### b. Attorney Work-Product and Attorney-Client Privileges

Defendant invoked attorney-client and/or attorney work-product privileges with respect to a subset of documents in its response to plaintiff's March 2023 request. Specifically, it invokes this privilege with respect to groups 1(B), 1(E), and 2(C) as labeled in the *Vaughn* index [Doc. 42-5, pp. 1–4]. Additionally, defendant invoked these privileges in connection with its response to plaintiff's April 2023 request [*See* Doc. 42-4, p. 20].

Plaintiff contends that defendant improperly invoked the attorney work-product privilege by withholding records based on both the attorney-client and attorney work-products privileges, rendering impossible a determination of whether the attorney

23

work-product privilege, alone, was properly invoked [Doc. 39, p. 16]. And even if the Court were to overlook this elision, plaintiff argues that invocation of the attorney work-product privilege is inappropriate given that these records were not prepared in anticipation of litigation [*Id*.]. Specifically, it points to the contractual agreements between TVA and Concentric, which were "created to perform analysis . . . [and] not in contemplation of litigation" [*Id*. at 17].

Defendant argues, as before in connection to the deliberative process privilege, that its declarations and *Vaughn* index provide sufficiently detailed justifications for its invocation of these privileges [Doc. 43, pp. 21, 23].

Plaintiff alleges that defendant improperly invoked the attorney work-product privilege for the first time in briefing, instead of the attorney-*client* privilege, which are separate and distinct [Doc. 46, p. 16]. Citing the agency's declarations, plaintiff argues that these documents fail to explain in sufficient detail how the exempted materials were prepared in anticipation of litigation [*Id*. at 17].

Defendant notes that plaintiff appears to concede its invocation of the attorney-client privilege was proper; however, it further contends that these two privileges "run concurrently" such that the Court's determination as to the grounds for withholding is immaterial as either would support its use of this exemption [Doc. 48, p. 6]. Regarding the "anticipation of litigation" requirement, defendant further submits that it faced litigation from environmental groups in response to its Cumberland EIS, making "potential litigation [ ] now a fact," attaching a separate complaint to this effect [*Id*.; *see* Doc. 48-2].

24

"The attorney work-product privilege protects 'the files and the mental impressions of an attorney . . . reflected, of course, in interviews, statements, memoranda, correspondence, briefs . . . and countless other tangible and intangible ways." *Rockwell Int'l Corp. v. U.S. Dep't of Just.*, 235 F.3d 598, 604–05 (D.C. Cir. 2001) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947)) (recognizing the availability of the attorney work-product privilege under FOIA Exemption 5); *see Butler v. U.S. Dep't of Just.*, 368 F. Supp. 2d 776, 785 (E.D. Mich. 2005) (determining that an agency properly withheld records pursuant to the attorney work-product privilege where records were collected in anticipation of litigation). The attorney-client privilege, by contrast, "functions to encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice." *Bd. of Commissioners of Clermont Cnty., Ohio v. EPA*, No. 1:17-CV-389, 2021 WL 391715, at *6 (S.D. Ohio Feb. 4, 2021) (quoting *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 925 F.3d 576, 589 (2d Cir. 2019)). For this privilege, "the question is whether the communication is confidential and aimed at seeking or conveying legal advice." *Id.*

As an initial matter, the Court has already determined that defendant's invocation of the deliberative process privilege with respect to withheld records in response to plaintiff's March 2023 request was appropriate (*see supra* Section III(B)(2)(a)). Given that defendant invokes both attorney privileges concurrently with the deliberative process privilege, it may be unnecessary to rule upon the propriety of these privileges provided that its deliberative process invocations survive the foreseeable harm and segregability

analyses. However, for avoidance of doubt, the Court proceeds to examine the propriety of these bases for withholding, as well.

Beginning with plaintiff's March 2023 request, defendant submits in its *Vaughn* index that group 1(B) and 1(E) records were withheld based upon the attorney-client privilege and/or attorney work-product privilege(s) because "records include edits and in some instances, comments between clients and attorneys" [Doc. 42-5, pp. 1, 2]. It separately submits that group 2(C) records were withheld because "[t]hese records include legal briefings/memos prepared by TVA's OGC Attorneys and/or outside counsel related to the agency's drafting of the Cumberland FEIS" [*Id*. at 4]. Collins submits largely similar explanations for these withholdings [*See* Doc. 42-4, pp. 12, 13, 15].

Defendant's explanations for invoking these privileges with respect to records in groups 1(B) and 1(E) are insufficiently detailed for the Court to determine whether the attorney-client and/or attorney work-product privileges are properly applied. First, the description combines with defendant's invocation of the deliberative process privilege such that the Court cannot determine, on the basis of the *Vaughn* index alone, *which* records are being withheld pursuant to either privilege [*See* Doc. 42-5, pp. 1–2]. More importantly, the Court cannot determine from the *Vaughn* index or defendant's declarations whether these records were prepared in anticipation of litigation and/or "whether the communication is confidential and aimed at seeking or conveying legal advice." *Bd. of Commissioners*, 2021 WL 391715, at *6 (quoting *Am. Civil Liberties Union*, 925 F.3d at 589 (2d Cir. 2019)). So, at this juncture, defendant's Exemption 5 withholdings for groups

1(B) and 1(E) will proceed under foreseeable harm and segregability analysis only as to the deliberative process privilege.

Group 2(C) records, by contrast, have been properly withheld pursuant to the attorney work-product privilege. These five records were prepared by agency attorneys and/or outside counsel to provide legal advice and guidance to the agency [Doc. 42-5, p. 4]. These records appear to contain the "files and the mental impressions of an attorney," *Rockwell Int'l*, 235 F.3d at 604–05, and are more readily determined as such from the format of the *Vaughn* index. Accordingly, defendant appears to have properly withheld these records additionally/alternatively under the attorney privileges discussed herein.

Turning to the April 2023 request, Collins states that "Concentric's consulting work was performed at the request of TVA's legal counsel and in preparation for potential litigation" [Doc. 42-4, p. 20]. Moreso than the explanations discussed above, defendant clearly invokes attorney-client and/or attorney work-product privileges with respect to these records. That is, they were prepared in anticipation of litigation and were aimed at seeking legal advice in direct response to TVA's legal counsel. *See Bd. of Commissioners*, 2021 WL 391715, at *6.

### 3. Sufficiency of Showing that Disclosure of the Withheld Information Would Cause Foreseeable Harm

Plaintiff argues that defendant has failed to adequately demonstrate foreseeable harm insofar as its determination letters "make no effort to explain how specific materials . . . would cause TVA harm" [Doc. 39, p. 11]. Broadly, it submits that defendant's justifications lack sufficient detail and rest on speculation and "abstract fears" [*Id*. at

27

11–12].  Plaintiff also notes that defendant's assertions of harm are unsupported by declarations or affidavits, which it submits are generally required to demonstrate compliance [*Id*. at 12].[5]

Defendant responds by arguing that the disclosure of Preliminary FEIS Records, NEPA Coordination Records, and Concentric records would cause foreseeable harm [Doc. 43, pp. 23, 27].  Specifically, it argues that disclosure of the former two categories could "chill[] frank and constructive opinions, criticisms, and recommendations in the future" [*Id*. at 23].  Additionally, it cites concerns that disclosure of draft materials could risk "public confusion" and/or could impair the attorney-client relationship in some cases [*Id*. at 24].  As for the latter category, defendant states that foreseeable harm is "self-evident" insofar as disclosure of confidential information would necessarily destroy the private nature of the information [*Id*. at 27].

Plaintiff replies by arguing that the *Vaughn* index's statements are too general and undetailed to satisfy this requirement [Doc. 46, p. 10].  It contends that defendant's attempt to explain the foreseeable harm of disclosure on a "privilege-by-privilege basis" does not allow the Court to fully ascertain whether they have articulated harm with respect to each withheld record [*Id*. at 10–11].

Defendant defends the detail and context provided in its *Vaughn* index, emphasizing again that its declarations are entitled to a presumption of good faith [Doc. 48, p. 3].  In

---

[5]  *See supra* note 2.

particular, defendant alleges that plaintiff overlooks subcategory designations contained in the index that provide greater detail about its justifications [*Id*. at 4].

The FOIA Improvement Act provides that "[a]n agency shall withhold information . . . only if the agency reasonably foresees that disclosure would harm an interest protected by" one of the nine FOIA exemptions. 5 U.S.C. § 552(a)(8)(A)(i)(I). This provision requires agencies withholding information under an exemption to show not only that a withheld record "falls within a FOIA exemption," but also "that the agency 'reasonably foresees that disclosure would harm an interest protected by [the] exemption.'" *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) (alteration in original) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)); *see also S. Env't L. Ctr.*, 659 F. Supp. 3d at 919 (holding that TVA met its burden to show foreseeable harm based on two declarations from private companies).

To satisfy the foreseeable harm requirement, defendant must explain how disclosing, in whole or in part, the specific information withheld under its invoked exemptions would harm an interest protected by the exemption, such as by causing "genuine harm to [its] owner's economic or business interests," *Argus Leader*, 588 U.S. 427 at 441 (Breyer, J., concurring in part), and thereby dissuading others from submitting similar information to the government. *See Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768 (D.C. Cir. 1974), *abrogated by Argus Leader*, 588 U.S. at 427. Agencies therefore "must provide more than 'nearly identical boilerplate statements' and 'generic and nebulous articulations of harm.'" *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (quoting *Jud. Watch v. U.S. Dep't of Just.*, No. CV 17-0832, 2019 WL 4644029, at

29

*4–5 (D.D.C. Sept. 24, 2019)). *See also Weikamp v. U.S. Dep't of the Navy*, No. 1:14 CV 22, 2014 WL 12748775, at *8 (N.D. Ohio Sept. 24, 2014) (initially denying government's summary judgment motion on grounds that it "ha[d] not shown a likelihood of substantial competitive harm" under Exemption 4).

Beginning with Exemption 4, defendant states that disclosure of Concentric's commercial information would "jeopardize a commercial entity's commercial interests or reveal information about its ongoing operations," as well as "harm[ing] the submitter's business interests and dissuad[ing] others from submitting similar information' [Doc. 37-2, p. 1]. As previously discussed, Concentric directly attested to these concerns in its letter dated March 21, 2024 [*See* Doc. 42-3, p. 1]. Based upon a review of the withheld records and defendant's submissions of foreseeable harm, the Court finds that disclosure of these records could cause "genuine harm to [its] owner's economic or business interests," *Argus Leader*, 588 U.S. 427 at 441, and that Exemption 4 is therefore properly applied here.

Turning to Exemption 5, defendant states that disclosure of privileged deliberative process materials would "would compromise TVA's decision-making process by chilling open and frank discussions and exchange of information within TVA on decision-making and policy formulation," and would "also cause public confusion as to the unverified direction of TVA policy" [Doc. 37-1, p. 2; *see* Doc. 37-3, p. 2]. Collins elaborated that disclosure could "inhibit the consultative process both with EPA staff and TVA employees; would constrain TVA employees in their future discussions, deliberations, and analyses such that TVA would not be able to render decisions based on thorough and unbiased information; and ultimately, would undermine the process of sound decision-making

30

necessary for TVA to achieve its statutory mission including least-cost planning" [Doc. 42-4 ¶ 22; *see id.* ¶ 39]. The Court finds that the harms foreseeable to defendant in connection with deliberative process material are reasonable and fall within the "interest protected by [the] exemption." *Machado*, 971 F.3d at 370. That is, the risk of inhibiting or chilling TVA's decision-making process, including through its discussions with other agencies, prior to reaching a final agency decision falls squarely within the purposes of Exemption 5's incorporation of this privilege.

As for the attorney-client privileged communications, defendant submits that disclosure would "harm the attorney client relationship because the attorneys would no longer be kept fully informed by their clients, resulting in unsound legal advice and advocacy" [Doc. 37-2, p. 2]. Collins further submits that 'routine disclosure of confidential communications between attorneys and their clients (here, TVA) would undermine one of the bedrock principles of the legal profession, as clients (TVA employees) would not feel comfortable asking their attorneys for legal advice and attorneys would not feel comfortable providing it if such communications were not kept confidential" [Doc. 42-4 ¶ 44]. Finally, defendant submits that disclosure of attorney work-product would "harm[ ] the adversarial trial process by exposing the attorney's preparation to public scrutiny" [Doc. 37-2, p. 2]. The Court finds that the harms cited by defendant regarding these records are also reasonable and related to the purposes for Exemption 5's incorporation of privileges that protect the confidentiality of attorney communications.

In sum, the Court finds that defendant has satisfied the foreseeable harm requirement with respect to each of its claimed Exemption 4 and 5 withholdings.

31

### 4. Segregability

Plaintiff broadly argues that defendant has failed to segregate non-exempt material due in part to its failure to provide an "itemized index of segregated materials" [Doc. 39, p. 19]. It later states that defendant's "blanket" and "conclusory" assertions related to segregability are inadequate for this analysis [Doc. 46, p. 20].

Defendant argues that it undertook a careful review of all withheld records and has released all non-exempt records available, citing again its declarations [Doc. 43, p. 28].

The Court must consider segregability with respect to each claimed FOIA Exemption. *Shteynlyuger v. Centers for Medicare & Medicaid Servs.*, 698 F. Supp. 3d 82, 131 (D.D.C. 2023). But "[b]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (first citing *Summers v. DOJ*, 140 F.3d 1077, 1081 (D.C. Cir. 1998); and then *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993)); *see also Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 309 (D.D.C. 2013) ("Even when a plaintiff does not challenge the segregability efforts of an agency, the Court has an affirmative duty to consider the segregability issue sua sponte." (quotation omitted)). Specifically, the Court must determine whether "'[a]ny reasonably segregable portion of a record shall be provided' after exempt portions are deleted." *Sussman*, 494 F.3d at 1112 (quoting 5 U.S.C. § 552(b)(1)(9)). *See also Eleiwa v. Transportation Sec. Admin.*, No. 2:15-CV-2571, 2016 WL 7497584, at *8 (W.D. Tenn. July 19, 2016) (holding that government satisfied its segregation obligation under FOIA

where agency supplemented initial withholdings and provided good-faith certification of withheld material).

Based on the nature of the records withheld by defendant, and its bases for withholding as discussed at length above, the Court finds that defendant has satisfied the segregability requirement with respect to both Exemptions 4 and 5. Given that plaintiff's April 2023 request sought records containing commercial, confidential information within the meaning of Exemption 4, and based on Concentric's representations regarding the risks of disclosure [*See* Doc. 42-3, p. 1], defendant reasonably withheld these records in full. *See Sussman*, 494 F.3d at 1116. As for privileged materials under Exemption 5, Collins stated that she "consulted with the FOIA Office and other relevant agency personnel" and personally conducted "a careful review of the withheld records to review for segregability" prior to disclosing records to plaintiff [Doc. 42-4 ¶ 27]. Accepting this declaration as a good faith certification, *see Rimmer*, 700 F.3d at 255 (citing *Jones*, 41 F.3d at 242–43), and in light of the nature of these privileged records, the Court similar finds that defendant reasonably withheld these records in full.

## IV.    Conclusion

For the reasons above, plaintiff's motion for summary judgment [Doc. 38] is **DENIED** and defendant's motion for summary judgment [Doc. 42] is **GRANTED**. An appropriate order shall enter.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE